Frank W. Volk, Chief Judge
United States Bankruptcy Court
Southern District of West Virginia

**Dated: September 30th, 2017**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

| IN RE: | CASE NO. 3:16-bk-30171 |
|---|---|
| MICKEY GALE CLARK, | CHAPTER 13 |
| Debtor. | JUDGE FRANK W. VOLK |
| TINA MARIE CLARK, | ADVERSARY PROCEEDING NO. 3:16-ap-3008 |
| Plaintiff, | |
| v. | |
| MICKEY GALE CLARK, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

The Court presently has under consideration a non-dischargeability dispute between Plaintiff Tina Marie Clark and Defendant Mickey Gale Clark, which commenced with the Complaint filed on July 14, 2016.

On July 25, 2016, Defendant Mickey Clark answered the Complaint. On February 7, 2017, the Court entered a briefing order. The Court received the Plaintiff Tina Clark's brief on February 15, 2017. (Dckts. 5; 14). On February 27, 2017, Mr. Clark responded. Ms. Clark replied on March 9, 2017. (Dckts 15; 16). On April 27, 2017, the Court convened the trial, during which the parties' evidence was received. The parties additionally filed post-trial briefs on May 10, 2017. (Dckts. 20; 21).

The matter is ready for adjudication. This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(I).

**I.**

Tina Clark seeks a judgment that (1) Mickey Clark's obligation to pay $40,000 to the sole benefit of the parties' child was created as a non-dischargeable domestic support obligation ("DSO"), and that (2) Mr. Clark must continue to make monthly payments until the obligation is satisfied.

Tina Clark and Mickey Clark were divorced on May 20, 2014, following a decree entered by the Court of Common Pleas in Lawrence County, Ohio. The parties have one child, Cameron Tyler Clark ("the Son"), who was approximately 14 years old at the time of the divorce. He was 17 years old in 2017. The parties share custody of the Son, but the Son spends most nights at Mickey Clark's house. The parties agreed to divide equally all childcare-related expenses and to dispense with child support. The parties have relatively equal income. They have made arrangements regarding taking turns to claim the Son on their income tax returns.

The Divorce Decree ("the Decree") does not have headings to separate different sections, but there are paragraphs on page two that appear to have separated the provisions on child support from those dealing with property settlement. The Decree provides Tina Clark with an exclusive property right to the marital residence and gives Mickey Clark an exclusive right to the M&M inflatable business and related business properties and documents. There are several documents attached to the Decree, which are titled as follows: (1) Child Support Computation Worksheet, and (2) Obligee's Rights and Remedies for Enforcement of Support, Instructions for Payment of Child Support, Relocation and Child Records Notice, Medical Insurance, and Shared

Parenting Plan.  The parties agree in the Decree that they will modify the Parenting Plan if necessary due to changes in their circumstances and if the changes are desirable to serve the Son's best interests.

While the Parties were going through the divorce, Tina Clark became concerned with potential health issues. She developed a desire to set aside money for the Son to use in adulthood.  Specifically,  Ms. Clark wanted to help the Son with his post-secondary vocational education and other post-majority financial needs.

Also during that time, Ms. Clark was demanding an additional $50,000 from Mickey Clark for her "share of the equity in the marital assets [Mickey Clark] was to receive." This particular issue became the "most significant stumbling block" in the Parties' divorce negotiations, and Mr. Clark eventually agreed to assume a $40,000 obligation ("the obligation" or "the funds") to resolve the dispute.   This obligation was one of the final things that the parties agreed upon in their divorce negotiations, and the obligation appeared to have equalized the division of marital assets.  The parties also agreed that the obligation was part of a "compromise on all issues."

The Decree states that the $40,000 funds must be used for the Son's benefit when he reaches adulthood and that neither party can withdraw money from the account unless the other party consents. Specifically, the Decree requires Mickey Clark to make a monthly payment of $500 into a "restricted savings account in both parties' names at a mutually agreeable banking institution." Mr. Clark must continue to make monthly payments as long as he "remains in a similar or the same kind of business."  Mr. Clark remains responsible for monthly payments if he is "no longer in the business as a result of selling the business."

3

Mickey Clark had paid $9,500 of the obligation when Tina Clark filed the instant Complaint in July of 2016.    Mr. Clark had continued to make monthly payments after he sold part of his business in 2015.  Mr. Clark then filed a Chapter 13 petition on April 12, 2016.  He thereafter communicated to Ms. Clark that he would make no further contribution toward the obligation.

Tina Clark filed her Complaint on July 14, 2016, alleging that Mickey Clark's attempt to discharge the agreed obligation was "wrongful and in contravention of [her] rights.". Ms. Clark sought a judgment that Mickey Clark's obligation was non-dischargeable in a Chapter 13 bankruptcy case and that Mr. Clark must consequently continue to pay $500 per month to the designated bank account until his remaining obligation becomes fully satisfied. Ms. Clark initially contended that Mickey Clark's obligation was non-dischargeable under either 11 U.S.C. § 523(a)(5) or § 523(a)(15). Ms. Clark, however, focused correctly on discussing section 523(a)(5) in her later pleadings.

Tina Clark urges the Court to conclude that the obligation is a DSO inasmuch as the language of the decree created a contributory fund solely to benefit the Son, both before and after he reaches eighteen (18) years of age. Mickey Clark characterizes the obligation as a dischargeable property settlement and contends that the parties never created a DSO. Mr. Clark asks the Court to discharge his obligation when he has completed his Chapter 13 plan and received a discharge under 11 U.S.C. § 1328(a).

## II.

### A. Governing Standard

Section 523 of the United States Bankruptcy Code provides a list of non-dischargeable debts. Section 523(a) provides pertinently as follows:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> …
> (5) for a [DSO];

11 U.S.C. § 523(a)(5).

The Court discussed generally the concept of discharge and exceptions thereto in *In re Adkins*, 567 B.R. 501, 507 (Bankr. S.D. W.Va. 2017). The material principles are well settled. First, a presumption exists that all debts owed by Mickey Clark are dischargeable unless the party contending otherwise proves nondischargeability. 11 U.S.C. § 727(b). The purpose of this "fresh start" is to protect "honest but unfortunate" debtors. *Bosiger v. US Airways, Inc.*, 510 F.3d 442, 448 (4th Cir. 2007). Second, courts are admonished to narrowly construe exceptions to discharge against the creditor and in favor of the debtor. *Kubota Tractor Corp. v. Strack*, 524 F.3d 493, 497 (4th Cir. 2008) (quoting *Foley & Lardner v. Biondo*, 180 F.3d 126, 130 (4th Cir. 1999)). Third, the burden is on the creditor to prove the exception to discharge by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287–88 (1991); *Kubota*, 524 F.3d at 497.

Generally, section 523(a)(5), along with subsection (a)(15), make DSOs and obligations "incurred as a part of a property settlement agreement" ("property settlement obligations") non-dischargeable debts. *In re Hardesty*, 553 B.R. 86, 90–91 (E.D. Va. 2016). Both sections are intended to provide greater protection to spouses, former spouses, and children during

5

bankruptcy. *In re Deberry*, 429 B.R. 532, 537 (Bankr. M.D.N.C. 2010); *see also In re Hardesty*, 553 B.R. at 90–91.

One key difference between sections 523(a)(5) and (a)(15) is that only the former applies to make debts nondischargeable in Chapter 13 cases. 11 U.S.C. § 1328(a)(2); *see In re Hardesty*, 553 B.R. at 90–91. It is thus incumbent upon a former spouse, in a non-dischargeability setting in a Chapter 13 case, to prove the subject debt is a DSO under section 523(a)(5), as opposed to a property settlement obligation under section 523(a)(15).

An obligation qualifies as a DSO if it is (1) owed to a spouse or child of a spouse, (2) "in the nature of alimony, maintenance, or support," (3) established by a divorce decree before a debtor spouse petitioned for relief under Chapter 13, and (4) "not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, [or] child of the debtor…" 11 U.S.C. § 101(14A); *In re Hardesty*, 553 B.R. at 90.

Ms. Clark is correct that the first, third and fourth elements the DSO definition are satisfied. The extant question is whether the Parties intended to create an obligation in the nature of "alimony, maintenance, or support" at the time of their divorce. (Dckt. 14 at 3). This is a factual issue governed by bankruptcy law. *See In re Hardesty*, 553 B.R. at 91 (citing *Matter of Long,* 794 F.2d 928, 930 (4th Cir. 1986)). The inquiry is guided by four non-exclusive factors aimed at divining the parties' intentions: (1) "the actual substance and language of the agreement," (2) "the financial situation of the parties at the time of the agreement," (3) "the function served by the obligation at the time of the agreement," and (4) "any evidence of overbearing at the time of the agreement." *In re Leviner*, --- B.R. ---, ---, 2017 WL 3986500, at *5 (Bankr. W.D.N.C. Sept. 8, 2017); *In re Hardesty*, 553 B.R. at 91 (citing *Catron v. Catron (In re Catron)*, 164 B.R. 912, 918–20 (E.D. Va. 1994)).

6

If the obligation is found to be non-dischargeable, Mr. Clark must list the obligation as a priority claim in his Chapter 13 Plan and repay it in full. 11 U.S.C. § 507(a)(1)(A); *In re Deberry*, 429 B.R. at 537. If, however, the Court concludes that both parties intended the obligation to be a property settlement obligation, the debt is subject to discharge upon plan completion and discharge under 11 U.S.C. § 1328(a). 11 U.S.C. § 523(a)(15); 11 U.S.C. § 1328(a)(2).

**B.     Analysis**

### 1.  Actual Substance and Language of the Agreement

Tina Clark contends that the language of the Decree creates a DSO solely benefitting the Son both before and after he reaches majority. (Dckt. 14 at 4). Ms. Clark notes that, prior to majority, the Divorce Decree allows either party to withdraw money from the account if the other party consents. (Dckt. 14 at 4). After the Son reaches age eighteen (18), the funds will finance his post-secondary education. She adds that a decision rendered in this district some three decades ago held that post-majority college funds could give rise to a non-dischargeable DSO. (Dckt. 14 at 4 (citing *In re Grijalva*, 72 B.R. 334, 338 (S.D. W.Va. 1987) (Haden, C.J.); Dckt. 16 at 2).[1]

Mickey Clark responds that his former spouse's assertions lack support in the text of the Decree. Mr. Clark points out the Parties' stipulation that the funds are "payable to said child *only* upon reaching age 18," and Tina Clark was prohibited from withdrawing funds prior to that

---

[1] Chief Judge Haden's decision in *Grijalva* involved circumstances quite distinct from those presented here, not the least of which is that the debtor in that action expressly agreed to pay for the post-secondary education of his child.

7

time (Dckt. 15 at 3 (citing Dckt. 10 at 1, emphasis added)). Further, Mr. Clark contends that the obligation cannot be a non-dischargeable DSO inasmuch as it was contingent upon his continued commercial success, unlike a "traditional support obligation." *Id.* at 7.

While not controlling, the language of the agreement creating the obligation carries substantial weight in determining the Parties' intentions. *In re Catron*, 164 B.R. at 919 (citing *In re Kettner*, 1991 WL 549386, at *2–3); *Tilley*, 789 F.2d at 1077–78 (concluding that the structured drafting and labels attached to the agreement clearly demonstrated parties' intent to separate alimony from property settlement issues). A court will often review the structure of the agreement, the proposed payment method, and any contingent termination provision. *In re Catron*, 164 B.R. at 919 (citing *In re Kettner*, 1991 WL 549386, at *2–3). Also, if an obligation is listed in a segment of the agreement that is separate and distinct from those discussing support obligations, then the opposing party must overcome a "substantial obstacle" to show that the obligation is created in the nature of alimony, maintenance, or support. *Tilley*, 789 F.2d at 1078.

Although the state court did not use headings to divide the Decree into different sections, it included a paragraph on page two to separate child support from property settlement issues. The first full paragraph on page two reads:

> Further instructions regarding the payment of child support, relocation of the parties and payment of medical expenses are attached hereto and incorporated herein.

(Dckt. 10-1 at 2.)

Following the quoted paragraph, in separate paragraphs, the state court lays out Tina Clark's obligation to pay for the Son's health insurance, the parties' respective property interests in the marital residence and the assets within it, in the business and its documents, in a vehicle, and in each other's retirement benefits, as well as Mickey Clark's $40,000 obligation. The listing of the subject obligation amidst other property settlement issues indicates that the structure of the Decree

8

characterizes the obligation as a debt incurred as a part of the Parties' property settlement agreement.

Further, one of the attached documents, "Obligee's Rights and Remedies for Enforcement of Support," states that:

> Obligor is restrained from making said payments directly to the Obligee and Obligee is enjoined from accepting direct payments. Any payments not made through the Lawrence County Child Support Enforcement Agency is a gift.

(Dckt. 10-1 at 8.)

Inasmuch as the Decree requires Debtor to deposit monthly payments into "a restricted savings account in both parties' names" instead of the Lawrence County Child Support Enforcement Agency, the Parties do not appear to have intended the obligation to be a DSO. *Id.* at 3.

The language of the Decree also demonstrates the Parties' intent to waive child support obligations. Tina Clark agreed in the Decree -- and admitted during her sworn testimony -- that the Parties did not owe each other any child support obligations due to their shared parenting arrangement. *Id.* at 2, 15; (Dckt. 21-1 at 4). The Parties also agreed to be individually responsible for any childcare expenses during the respective periods they had physical custody of the Son. (Dckt. 21-1 at 7). In sum, the language of the Decree and Parties' testimony indicates a waiver of all DSOs.

It is noteworthy that Tina Clark struggles to provide textual support for her interpretation of the Decree. Contrary to her position, the Decree is crystal clear -- and detrimental to her assertions -- respecting whether funds may be withdrawn from the savings account before the Son reaches age eighteen (18). Ms. Clark referred in her arguments to the second full paragraph on page 3 of the Decree, which states:

9

> "It is ORDERED that Plaintiff shall pay the sum of $40,000 payable at the rate of $500 per month, beginning May 10, 2014, with all payments being deposited in a restricted savings account . . . .Such account shall be held by the parties as custodians or trustees for the minor child, to be used for his benefit when he *becomes an adult*. It is ORDERED that neither party shall have the right to withdraw any funds from the account pursuant to the contract with bank *unless the other party has consented.*"

(Dckt. 10-1 at 3, emphasis added). This provision, however, establishes: (1) the money must be used to the Son's benefit when he becomes an adult, and (2) neither party can withdraw funds unless the other party consents. Neither fact aids Ms. Clark's position.2

Based upon the foregoing discussion, the Actual Substance and Language of the Agreement counsels against a DSO finding.

### 2. The Parties' Financial Situations

The Parties stipulated that they have relatively equal income. But Tina Clark claims that Mickey Clark has "much larger financial assets at his disposal" and "significant prospects for further income" if he liquidates his business properties. (Dckt. 14 at 4; Dckt. 15 at 7). During the divorce negotiations, Ms. Clark believed that the inflatable business that Mickey Clark received

---

2  The Court is keenly aware of decisional law that will, at times, treat as a domestic support obligation those agreements to pay educational or similar support expenses of minor children through their college education and adulthood. *See*, *e.g.*, Hon. William H. Brown, *Bankruptcy and Domestic Relations Manual* § 6:9 (Supp. 2017) ("If the parties agreed in their marital dissolution agreement that the debtor would be responsible for education expenses of the children that would continue through their college education, even though that would be an obligation beyond their reaching majority age, that obligation could be a support one that would survive discharge."); 3 Bankr. Service L. Ed. § 27:1061 (Supp. 2017) (citing cases).
   The circumstances here are distinct for a variety of reasons, not the least of which are that (1) the above language quoted from the Decree is opaque at best on the question of the parties' mutual intentions, and (2) there are palpable differences between a broadly construed "support" obligation under § 523(a)(5), and, as here, a fund that was merely to "benefit" the adult offspring. It is also significant that the $40,000 obligation is what laid to rest a simmering and bitter property dispute in a case where both spouses readily admit they mutually had forsaken child support obligations.

was worth more than the house that she received. Consequently, she sought an additional $50,000 for a more equitable share of the marital assets. (Dckt. 21-1 at 4, 6). Tina Clark refers to this dispute over their respective interests in the business "the most significant stumbling" block in their divorce negotiations, with Mr. Clark eventually agreeing to assume the aforementioned $40,000 obligation to resolve the dispute. (Dckt. 20 at 2). Mickey Clark responds that, assuming there was a disparity during the divorce negotiations, he remedied that by assuming the obligation. (Dckt. 15 at 7).

Courts are more likely to consider an obligation a DSO if (1) there is a considerable income disparity between the parties, and (2) without Debtor paying the obligation, the party with lower income is unable to support him or herself and any minor children. *In re Crosby*, 229 B.R. 679, 682 (Bankr. E.D. Va. 1998); *see also In re Catron*, 164 B.R. at 919.

In view of the Parties' mutual adjustment of any perceived financial disparity, along with the terms underlying the obligation, Tina Clark ultimately fails to discharge her burden of proving disparity. The Parties have relatively equal income, and they mutually agreed about claiming a portion of each other's retirement benefits and about alternating tax deductions arising from the Son's care. (Dckt. 14 at 6; Dckt. 15 at 7; Dckt. 10-1 at 15). Further, unlike in *In re Crosby*, Tina Clark appears capable of supporting the Son and herself without any financial support from Mickey Clark. Indeed, Ms. Clark testified that she could afford her share of the Son's expenses without Mickey Clark's help. (Dckt. 21-1 at 5). The Court also concludes that any disparity that appeared was remedied when Mr. Clark assumed the $40,000 obligation. This too weighs against a DSO finding.

### 3. Intended Function of the Obligation

Tina Clark emphasizes her responsible and admirable intention to provide the Son with sufficient funds to "take care of himself as a young adult" in case she were to develop a serious illness. *Id.* at 5. She wants to assure there are such funds as may be needed to finance the Son's post-secondary vocational training to "improve his employment prospects as an adult." (Dckt. 20 at 2; Dckt. 21-1 at 6).

Ms. Clark focused on Mickey Clark's testimony that the obligation "is not a property settlement." (Dckt. 20 at 2). Mr. Clark counters that there was never a mutual intent to create a DSO; "the only function advanced . . . by the creation of this obligation is the settlement of the division of marital property" (Dckt. 15 at 3, 5, 7; Dckt 21 at 3, 5; Dckt. 10 at 2). Mr. Clark also points out that the Parties intended no child-support obligation because they agreed to share equally parenting duties and costs, and that the Parties can afford the Son's expenses without any use of the funds arising from the obligation. (Dckt. 21 at 5). Additionally, Mr. Clark states that the Son is a third-party beneficiary in this case, and the fact that he benefits, either directly or indirectly, from the fund does not transform the obligation into a non-dischargeable DSO. (Dckt. 15 at 6).

Courts consider the circumstances surrounding Parties' divorce to determine parties' *mutual intent* to create the obligation. *In re Hardesty*, 553 B.R. at 95 (*citing Tilley*, 789 F.2d at 1077). Relevant factors include "whether the obligation allocates debt or divides property . . . and whether the obligation was intended to provide for basic necessities." *In re Hardesty*, 553 B.R. at 95 (citing *Lawrence v. Combs (In re Combs)*, 543 B.R. 780, 799 (Bankr. E.D. Va. 2016)).

Tina Clark must demonstrate more than her intention to use the funds as a DSO; she is obliged as well to demonstrate Mickey Clark's shared intent. This she has not done. Ms.

Clark claims that the Parties intended the obligation to be a DSO because Mickey Clark testified that the obligation "is not a property settlement." (Dckt. 20 at 2). This layperson's characterization must be taken in context from the entirety of his testimony at the hearing in this matter:

> [Tina Clark's Attorney]: If it's your position that this money is property settlement, if you will, why was it paid for your son's benefit?
>
> [Mickey Clark]: It's not a property settlement. It was agreed to put it in an account to help him out. Not to give to her."

(Dckt. 21-1 at 9). The excerpt indicates that Mickey Clark does not consider the obligation as a property settlement because he did not intend it to benefit Tina Clark. Even Tina Clark acknowledges that Mr. Clark "prefer[s] to pay money to a fund for his child rather than pay anything to his ex-wife." (Dckt. 20 at 2). There are other considerations that dilute Mr. Clark's stray observation.

First, Tina Clark concedes that the obligation was created to pay for her "share of the equity in the martial assets [Mickey Clark] was to receive." (Dckt. 10 at 2). Second, she testified that the obligation first "came about" because she wanted more money to equalize the difference in marital asset distribution. (Dckt. 21-1 at 7). She also offers that the obligation was one of the final things that Parties agreed to in their negotiations. (Dckt. 21-1 at 5). In doing so, she acknowledges that the division of the Parties' marital interest in Mr. Clark's business was "the most significant stumbling" block during their negotiations, and that the Parties' decision to eventually settle on the $40,000 obligation was a "compromise after negotiations." (Dckt. 20 at 2; Dckt. 10 at 2).

While the calculus is closer on this factor, it is at best neutral and, in the Court's estimation, tips somewhat to supporting Mickey Clark's position that the obligation is in the

13

nature of a property settlement device, despite the fact that the obligation can be used to benefit the Son.

### 4. Evidence of Overbearing

The analysis ends with the Court scrutinizing the circumstances to surface any gross unfairness or lack of representation during the divorce proceedings. *In re Hardesty*, 553 B.R. at 95. Neither party provided any evidence of overbearing. They stipulated that they were represented by counsel during their contested divorce negotiations. (Dckt. 14 at 5; Dckt. 15 at 8–9). They also understood the legal implications of the Decree and the shared parenting plan. (Dckt. 10-1 at 16). Accordingly, this factor does not weigh in favor of finding a DSO.

## III.

Based upon the foregoing discussion, the Court finds that the remainder of the $40,000 obligation is **NOT A DOMESTIC SUPPORT OBLIGATION** under Bankruptcy Code Section 523(a)(5)**.**  Thus, **IT IS ORDERED** that the remaining obligation owed by the Debtor/Defendant, Mickey Gale Clark, to the Plaintiff, Tina Marie Clark, is dischargeable.

In closing, the Court notes in the margin certain nonexclusive instances where greater care should have been exercised by counsel in submitting this matter for decision. The Court will expect that care in future submissions.[3]

---

[3] First, Tina Clark claims in her filings that she would not have agreed to the rest of the divorce Decree if Mickey Clark did not agree to the obligation at hand. (Dckt. 14 at 5; Dckt. 16 at 1). Tina Clark actually testified that she would still have agreed to the Decree if the terms of the obligation were different because she wanted to avoid the Son having to testify. (Dckt. 21-A at transcript p. 11). Second, as noted earlier, Tina Clark claims that Mr. Clark testified the obligation was "not a property settlement – *it's support.*" (Dckt. 20 at 2, emphasis added by Ms. Clark's attorney). The transcript omits the emphasized portion, which is misleading on a matter material to the Court's decision. (Dckt. 21-A at transcript p. 24). Third, Tina Clark stated in her final response that Mr. Clark admitted under cross-examination that the language in the decree does not allow this obligation to be extinguished simply because he filed a chapter 13 bankruptcy petition." (Dckt. 20 at 2–3). In actuality, Mickey Clark testified that "my understanding of . . . if we would've had to went to bankruptcy that would have cleaned me from this [obligation] and that "[i]f I ever filed bankruptcy, yes, [the obligation] would go away because I couldn't afford to pay it." (Dckt. 21-A at transcript pp. 20, 22).